McLENDON et al. v. LOEW'S, Inc., et al.

Civ. No. 2703.

District Court, N. D. Texas,
Dallas Division.
March 10, 1948.

Clark, Coon, Holt & Fisher, of Dallas, Tex., and Thomas C. McConnell and Norman Korfist, both of Chicago, Ill., for plaintiffs.

Joe Worsham, of Dallas, Tex., for Interstate Circuit, Inc.

George S. Wright, of Dallas, Tex., for all other defendants except Robb & Rowley.

L. M. Rice, of Dallas, Tex., for Robb & Rowley.

ATWELL, District Judge.

The suit complexioned by the restraint sought under the Anti-Trust Acts, and for $1,200,000 damages, was filed on September 15, 1947.

The damages claimed grow out of a sale by the plaintiffs, B. R. McLendon, at all times acting for all of the plaintiffs, alleged to have been forced, of the Beverly Hills theater to defendants, Robb & Rowley, and to the alleged discrimination that the Beverly Hills theater suffered while operated by the plaintiffs, as well as discriminations suffered by the

Casa Linda theater, still owned by the plaintiffs. That such discriminations in both instances were the result of a conspiracy between the defendants in violation of the Trust statutes. Sherman Anti-Trust Act, 15 U.S.C.A. § 1 et seq., and Secs. 1, 4 and 16, Clayton Act, 15 U.S. C.A. §§ 12, 15, 26, 44, in its original and amended form.

The testimony discloses that prior to the plaintiff's coming to Dallas a few years previous, both Robb & Rowley and the Interstate had been exhibitors of moving pictures in metropolitan Dallas. That area consisted of what is commonly designated as the Oak Cliff portion, which is west of the Trinity River, and that portion considerably larger, which is composed of a number of suburban districts as well as the downtown section, and included such suburbs as Highland Park, University Park, Lakewood and others.

Metropolitan Dallas has sixty-five theaters. In that part of Dallas east of the Trinity, Interstate, as well as other owners, not necessary to mention, operate, of which Interstate has approximately nineteen theaters. In the part west of the Trinity known as Oak Cliff, Robb & Rowley have six theaters, and there are others unnecessary to mention.

When the plaintiff came to Dallas he was learned in the picture business, was a successful trader, and had been a lawyer for some twenty-seven years. He chose sites for two theaters, one in a very sparsely settled location east of the Trinity, and a similar sparsely settled portion west of the Trinity. The first he named the Casa Linda, and the second, the Beverly Hills.

After the erection and opening of each and enjoying the income therefrom he solicited the sale of the Beverly Hills to Robb & Rowley, and after such profitable sale he solicited the sale of the Casa Linda to the Interstate. In the presentment of his reasons for each of such solicitations there was no complaint of either business or restriction, and, in truth, his profit on the Beverly Hills sale was approximately what he thought he was entitled to.

His string of theaters outside of the two suburban Dallas theaters, is known as the Tri-state. He operates or has operated theaters in Texas, outside of Dallas, Louisiana, Oklahoma and Arkansas.

Among the reasons assigned for the sales of Beverly Hills and Casa Linda was an alleged indebtedness to Dallas banks, and that his son, one of the plaintiffs, needed a large sum of money to go into the radio business.

Prior to the filing of this suit, he had been furnished pictures by certain distributors on what is called "test runs," which means a division of profit between the distributor and the exhibitor. The distributors did not think that he had properly accounted for the proceeds from such pictures and that they had not gotten their appropriate part and they insisted upon an inspection of records and verification of the amounts that he had paid to them. This, he resisted, and, since they still persisted, he filed this suit.

During the taking of testimony, the words, "clearance," "availability," and "admission price," were the crucial points. Great volumes of exhibits were garnered, as were also voluminous depositions and a large record of oral testimony, charts, summaries, etc., so that the hearing of the cause occupied an entire week, including some rather extended sessions and one night session, all calling for deep and careful consideration.

Such consideration includes the thought that the moving picture, as it comes to the public, is short-lived. It consists of a string of small pictures which are so ingeniusly connected and operated as to have a fascinating continuity and are thrown upon a screen with accompanying music, words, gestures and colorings. The life of a film is measured by a rather brief number of exhibitions, perhaps, under twenty. These films are produced in California and shipped to the respective key points, or exchanges, throughout the United States, one of which is Dallas, and another, Camden, New Jersey. Quite frequently they reach Dallas from the New Jersey depot. These films are never sold. They are merely leased to the exhibitor.

392

Such leases are usually printed contracts, inquiring as to the name, location, admission price, and mutual covenants as to availability for exhibition, clearance, return, etc.

These contracts, while containing blanks which cover practically the same information as does the ordinary rental contract for real estate, or, warranty deed for such estate, were in no sense, the result of agreement or conspiracy between either the producers or distributors, or any other interested exhibitor. They were information that went to the lessor, practically the same information as goes to all life insurance companies, or, fire insurance companies before policies are issued.

The distributor, vested with a property right, certainly was entitled to enjoy the fruitage of an uncoerced contract between itself and its lessee, and the proper return of its property to it after the lessee's term had been completed.

"Clearance," and "availability," are recognized in the reasonable grounds assigned in United States v. Paramount Pictures, 66 F.Supp. 323, and in United States v. Interstate Circuit, 20 F.Supp. 868, affirmed in 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610.

The downtown theaters, Majestic and Palace, of metropolitan Dallas, were, beyond question, entitled to such priority as was given them. The same may be said of the other theaters throughout the city.

The testimony shows that the admission price for all the theaters in Dallas is below that of any other comparable city in the United States. There were three pictures which were shown at a larger price in Dallas than the public in Dallas usually has to pay, though not in excess of the prices which were charged for the same pictures in other cities, but they were what is known as "road shows," and included the effort of the exhibitor and distributor to determine the value of the particular film as an attraction. In such three instances, the distributor divided super advertising costs with the exhibitor and the receipts had ratable and proportionate division.

Upon the controversial points, the plaintiff has failed to successfully meet the requirement of the burden of proof, and upon the submission of testimony which, for its truthfulness and weight, is the solvent. He is not entitled to any equitable relief, nor to any damages.

A motion which was made by the defendants at the conclusion of the plaintiff's testimony, had there been a jury called for the assistance of the court as to that feature, would have been granted, because it would have been error to have refused it.

### Finding of Facts.

1. The films that were sold and displayed at Dallas, Texas, by all of the parties, were interstate commerce.

2. That the contracts for the same were made independently by the respective distributors with the respective exhibitors, and that neither producers nor distributors made an agreement with reference to availability, admission price, nor any other matter with any other distributor or producer or exhibitor named as a defendant. Each acted independently.

3. That any and all recognized the propriety of the Majestic and Palace as the best houses in Dallas in all points that should be reasonably considered in passing upon first-run privileges. That "availability" and "clearance," though somewhat synonymous, were not the result of an agreement or conspiracy among the defendants.

4. That the exhibitors made their own admission prices and upon such admission prices each of the defendants exercised his own judgment as to the charges that would be made for films that would be exhibited by such exhibitor.

5. That in determining "availability" and "clearance," whichever is applicable, the standards and determinations that enter into a grading of the exhibitor's location, seating capacity, appointments, and advertising that had been indulged by the first-run houses, and the advantages that accrued to subsequent run distributors by reason of such advertising, were appropriate and reasonable.

### Conclusions of Law

It follows from what I have said, that the plaintiffs are not entitled to recover and the decree may go for the defendants.